# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| **HORACE MCCANN,** } | |
| } | |
| **Plaintiff,** } | |
| } | |
| **v.** } | **Case No.: 2:07-CV-1659-RDP** |
| } | |
| **ELAINE CHAO, Secretary, U.S.** } | |
| **Department of Labor,** } | |
| } | |
| **Defendant.** } | |

## MEMORANDUM OPINION

This case is before the court on Defendant's Motion for Summary Judgment (Doc. #21), filed April 15, 2009. The parties have fully briefed the issues raised by Defendant's Motion, which is now properly under submission. For the reasons set forth in this Memorandum Opinion, Defendant's Motion is due to be granted in part and denied in part.

## I.    PROCEDURAL HISTORY

Plaintiff has worked for Defendant for thirty years, including twenty-five years as an Industrial Hygienist. (Doc. #23-3 at 82). Plaintiff is an African American male and, during the time relevant to this lawsuit, was sixty-one years old. (Doc. #23-3 at 43).

On November 7, 2005, concerned that Defendant had illegally discriminated against him, Plaintiff contacted an EEO counselor for the U.S. Department of Labor. (Doc. #23-3 at 41, 43). During this initial conference, Plaintiff alleged that Defendant discriminated against him on the basis of race, age, and sex as well as in retaliation for his prior EEO activity. (Doc. #23-3 at 41).

On November 11, 2005, Plaintiff filed an informal complaint of discrimination. (Doc. #23-3 at 49). In his informal complaint, Plaintiff identified seven allegedly discriminatory events: (1) a

verbal reprimand; (2) an average performance evaluation without a corresponding narrative explanation; (3) the denial of personal protective equipment ("PPE"); (4) a reference to his work area as the "dinosaur area;" (5) refusal to permit him to serve as Acting Area Director and Acting Assistant Area Director; (6) the denial of "supplies or equipment (such as belts or fold sampling pumps on employees);" and (7) general reprisal for his prior EEO activity. (Doc. #23-3 at 51). The EEO counselor investigated Plaintiff's claims but "was unable to resolve the complaint at the informal stage." (Doc. #23-3 at 67).

On December 27, 2005, Plaintiff, dissatisfied with the EEO counselor's attempts at informal resolution, filed a formal complaint with the Civil Rights Center ("CRC") of the U.S. Department of Labor. (Doc. #23-3 at 58; Doc. #23-2 at 56). The CRC accepted the following issue for investigation:

> Whether [Defendant] discriminated against [Plaintiff] based on [his] race (Black), sex (Male), age (61 years old) and/or reprisal for prior EEO activity when 1) on October 11, 2005, [Plaintiff was] issued a rating of "Meets" on [his] performance appraisal without written narratives; 2) [Plaintiff was] allegedly denied work equipment (*e.g.*, safety shoes, work glasses, and other equipment) by agency officials; and 3) [Plaintiff was] allegedly denied the opportunity to serve as acting Area Director and/or Assistant Area Director.

(Doc. #23-3 at 58). The CRC, however, did not accept for investigation Plaintiff's claims regarding the October 6, 2005 verbal reprimand or the November 2, 2005 statement regarding the "dinosaur area." (Doc. #23-3 at 58). Specifically, the CRC refused to investigate these claims because the "verbal reprimand and miscellaneous comments" did not "rise[] to a level sufficient to support a finding that [Plaintiff] suffered a present harm or loss with respect to a term, condition or privilege of employment for which there is a remedy." (Doc. #23-3 at 58).

2

On April 4, 2006, Plaintiff replied to the CRC's statement regarding the scope of the investigation. (Doc. #23-3 at 61). Plaintiff requested the CRC to revise its issue for investigation to include the verbal reprimand and pejorative age reference. (Doc. #23-3 at 61). In response, the CRC adhered to its prior issue statement because "[t]he record of this complaint does not demonstrate that any adverse action has resulted from the verbal reprimand." (Doc. #23-3 at 62). The CRC conducted its formal investigation of Plaintiff's allegations.

At the conclusion of the investigation, on November 8, 2006, the CRC provided Plaintiff with a copy of the Report of Investigation. (Doc. #23-2 at 31). At that stage, Plaintiff had the option to elect for either a hearing before an Equal Employment Opportunity Commission's administrative law judge or an agency decision on the record. (Doc. #23-2 at 31). Plaintiff opted for neither, and the CRC issued a Final Agency Decision on June 13, 2007. (Doc. #23-2 at 42). The CRC's Final Agency Decision concluded that Plaintiff "failed to establish by a preponderance of the evidence that he was subjected to discrimination on the basis of race, sex, age, or reprisal." (Doc. #23-2 at 41). Dissatisfied with the CRC's conclusion, Plaintiff, within the ninety day time frame, filed this lawsuit on September 12, 2007. (Doc. #1). Contrary to his administrative complaints, he alleged only age discrimination and retaliation – he dropped from his lawsuit claims of race and sex discrimination. (Doc. #1).

## II.     STATEMENT OF FACTS

### A.     Plaintiff's Prior EEO Activity

Before this case, Plaintiff filed EEO complaints against Defendant, which eventually resulted in the case styled *Horace McCann v. Alexis M. Herman, et al.*, Case No. 2:98-CV-2151-UWC.

(Doc. #23-3 at 73).  Plaintiff and Defendant settled that case in 2000.  (Doc. #23-3 at 73).  Plaintiff alleges that seven of Defendant's employees were aware of this prior activity.

First, Plaintiff claims that Cindy Coe Laseter, Defendant's Regional Administrator, was aware of his prior EEO activity.  (Doc. #23-3 at 73).  Cindy Coe Laseter became Regional Administrator around 2000.  (Doc. #23-3 at 44).  At that time, she received a briefing on all EEO activity in the office, including Plaintiff's pending complaints and, presumably, the federal litigation.  (Doc. #23-3 at 44).  During the relevant period of this lawsuit, Cindy Coe Laseter was unable to recall the specific events precipitating Plaintiff's earlier EEO activity.  (Doc. #23-3 at 44).

Second, Harold Ciancio, Defendant's Assistant Area Director and Plaintiff's immediate supervisor, was allegedly aware of Plaintiff's prior EEO activity.  (Doc. #23-3 at 73).  According to Plaintiff:

> Mr. Ciancio has said to [Plaintiff] on many occasions that he was aware of [Plaintiff] filing prior EEO complaints and of [his] EEO activities before he came to Birmingham.  He said he was told by several people in his previous Jacksonville, Florida Area Office to watch out for [Plaintiff].  He said to [Plaintiff], they told him [Plaintiff] was a trouble maker.  He said to [Plaintiff] they told him [Plaintiff] had filed numerous EEO complaints against a previous supervisor and as a result the supervisor (Paul Alvarado, [Assistant Area Director]) is no longer supervising employees.

> Mr. Ciancio, [Assistant Area Director], has told [Plaintiff] that because of [Plaintiff's] monetary settlement the Region IV and the Birmingham Area Office can not [sic] provide to [Compliance Safety and Health Officers] all the training and equipment the [Compliance Safety and Health Officers] need.  He said the settlement money came out of Region IV's budget.

> (This explains why [Plaintiff is] always last to get training, the first to be canceled out of training that was approved through Individual Develop Plan . . . and the last to get personal protective

4

equipment (such as safety shoes and safety glasses needed to do [Plaintiff's] job.)

(Doc. #23-3 at 73). Responding to these alleged exchanges, Harold Ciancio stated that these "conversation[s] never took place." (Doc. #23-5 at 34). In fact, he claimed that Plaintiff's only EEO activity of which he was aware was the EEO activity triggering this lawsuit. (Doc. #23-5 at 34).

Finally, Plaintiff also claims that five Compliance Safety and Health Officers ("CSHOs") were aware of his prior EEO activity:

> CSHOs in the Birmingham Area Office (such as Ron Hynes, Ed Keith, Phyllis Battle, Alpha Davis, and [Shawn] Sharp) have said to [Plaintiff] they were told that the reason given to them, by the Supervisor, that they could not get more training and equipment was because of the EEO settlement money given to [Plaintiff]. These CSHOs have, many times, asked [Plaintiff] how much the settlement was. [Plaintiff] always replied the agreement does not allow [him] to discuss [his] EEO case with others.

(Doc. #23-3 at 73). With the exception of Alpha Davis, however, the CSHOs denied having knowledge of Plaintiff's prior EEO activity, and none of the CSHOs recalled being told that the reason for the supposed training and equipment caps stemmed from the 2000 settlement between Plaintiff and Defendant:

> Phyllis D. Battle: "I do not recall being informed that [Plaintiff] had prior EEO activity or being told anything relative to EEO settlement money given to [Plaintiff]."
> Alpha B. Davis: "I was aware that [Plaintiff] had prior EEO activity because I was contacted in 2000 to provide a statement for a prior EEO complaint. I never heard that the reason the office could not get more training and equipment was because of EEO settlement money given to [Plaintiff]."
> Patrick Shawn Sharp: "I was not informed that [Plaintiff] had prior EEO activity and I never heard anything relative to EEO settlement money given to [Plaintiff]."

5

> Edmond L. Keith: "I did not know that [Plaintiff] had prior EEO activity and I never heard that excuse for why this office doesn't get more training or equipment."
>
> Ronald P. Hynes: "I did not know that [Plaintiff] had prior EEO activity, I only heard rumors.   During an all-staff meeting in sometime in mid-2005, Roberto Sanchez, Area Director, made a statement that there was no training or equipment money for the office."

(Doc. #23-5 at 20, 23, 26, 29, 32).[1]

Plaintiff's informal and formal complaints, filed during the administrative review process, cited only his prior EEO complaint and its resulting lawsuit as the source of the allegedly retaliatory acts by Defendant.  (Doc. #23-2 at 58; Doc. #23-3 at 51).  At some point, however, during the CRC's investigation of Plaintiff's allegations, his prior participatory activity expanded to include his involvement with Carrie Dooley's EEO case.  (Doc. #23-2 at 32).  Specifically, in the final agency decision, the CRC Director observed that "[t]he record also indicates that [Plaintiff] engaged in EEO activity during the investigation of an EEO complaint filed by [Carrie Dooley]."  (Doc. #23-2 at 32). The evidence submitted during the formal investigation demonstrated that Plaintiff provided a witness affidavit in 2002 during Carrie Dooley's EEO proceedings.  (Doc. #23-3 at 79-87). Additionally, the witness affidavit indicated that Plaintiff had testified in 1999 in an EEOC hearing between Carrie Dooley and Defendant.  (Doc. #23-3 at 83).

In Plaintiff's complaint, filed in this lawsuit, he specified the following EEO participation in addition to his 2000 EEO complaint and attendant lawsuit: (1) "Plaintiff gave testimony in court on behalf of Carrie S. Dooley in 1999 in EEOC case NO. 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[] and testified in that hearing

---

[1] In Plaintiff's supplement to the CRC's file, to this evidence, he stated, "I can understand why the interviewed Compliance Officers, in the Birmingham Area Office, would not want to get involved in my EEO complaint; seeing how much trouble I have gone through for filing EEO complaints and getting involve[d] in complaints of others.  Especially after being informed that their comment[s] will get back to their Supervisors."  (Doc. #23-5 at 114).

that he believed that blacks were not treated the same as whites and that racism was prevalent in the agency," and (2) "In April of 2002, [P]laintiff gave a witness affidavit in Carrie Dooley's EEO case, again claiming that blacks were not treated as well as whites and that racism was prevalent in the agency." (Doc. #1 at 2). Plaintiff's opposition to Defendant's motion for summary judgment identifies other supposedly protected activities giving rise to Defendant's allegedly retaliatory responses: (1) in 2003, "after not receiving a cash award for exceptional performance on a big file [P]laintiff was working, [P]laintiff told Mr. Ciancio that he, Mr. Ciancio, was treating him worse than white counter-parts because he was black," (2) on January 5, 2005, "[P]laintiff told Mr. Ciancio when he did not give [P]laintiff an exceptional performance award that he cost him . . . the award because he . . . was black," and (3) on August 16, 2005, "[P]laintiff told both Mr. Harold Ciancio and Roberto Sanchez because he was black, during once again, not getting a performance award." (Doc. #24 at 4-5; Doc. #23-2 at 25). Plaintiff did not address these events during the administrative phase of this litigation.

**B.     October 6, 2005 Reprimand**

Plaintiff claims that he suffered a verbal reprimand at an October 6, 2005 meeting, which resulted from discriminatory and/or retaliatory motivation. (Doc. #1 at 2). Defendant assigned the task of inspecting MAYCO Industries to Plaintiff in April 2005. (Doc. #23-2 at 59). The inspection commenced on May 2, 2005 and concluded on May 28, 2005, and a proposed penalty of $149,500 was submitted. (Doc. #23-2 at 59). The formal inspection meeting, held at Defendant's Atlanta Regional Office, was set for October 6, 2005. (Doc. #23-2 at 59). Aside from Plaintiff, those in attendance were Cindy Coe Laseter, Regional Administrator; Teresa Harrison, Deputy Regional Administrator; William Fulcher, Safety Manager; Linda McLaughlin, Safety and Health Manager;

Solomon Raines, Industrial Hygienist; Sharon Calhoun, Solicitor; Roberto Sanchez, Area Director; and Harold Ciancio, Assistant Area Director.  (Doc. #23-2 at 59).

Plaintiff began the presentation, which documented the cited violations, and the group discussed the relevant sanctions available.  (Doc. #23-2 at 59-60).  At this point, Plaintiff showed video of the inspection.  (Doc. #23-2 at 60-61).  During the screening, Cindy Coe Laseter, Regional Administrator, asked Plaintiff whether he wore a respirator, a tyvex suit, and booties over his shoes.  (Doc. #23-2 at 61).  Plaintiff answered, "No."  (Doc. #23-2 at 61).  In response, Laseter told Plaintiff that he "kn[ew] better than that; [he had] just jeopardized the entire inspection by not wearing PPE (Personal Protective Equipment)."  (Doc. #23-2 at 61).  Laseter was concerned that sanctions would be inappropriate because Plaintiff had compromised the inspection by failing to observe the PPE protocols.  (Doc. #23-2 at 61).

Laseter also questioned Plaintiff as to whether he took wipe samples.  (Doc. #23-2 at 61).  Plaintiff answered, "No," but he clarified that, because the employees were working with almost pure lead, the sampling was unnecessary.  (Doc. #23-2 at 61).  Finally, Laseter asked whether Plaintiff had showered at the plant.  (Doc. #23-2 at 61).  Again, Plaintiff answered, "No."  (Doc. #23-2 at 61).  Plaintiff maintained that Defendant's Lead Standard, 29 C.F.R. § 1910.1025(g)(1)(i-ii), (g)(3), did not require him to shower while present.  (Doc. #23-2 at 61).  In response to her inquiries, Laseter stated that Plaintiff was "tromping around in [his] Wing-Tips shoes, not wearing a respirator, not taking a shower before leaving the plant," and as a result she was "disappointed" in Plaintiff because he did "not do a professional job."  (Doc. #23-2 at 61).[2]

---

[2]After the CRC issued its final agency decision, Plaintiff sent a letter supplementing his file.  In it, Plaintiff changed his story regarding this meeting: "I . . . was the one who took the video, not the one she (Ms. Laseter) saw in the video.  At no time was I in the video.  The person she saw in the video and at the point of operation with the

Because of these infractions, Laseter concluded that they would be unable to justify the sanctions, which would have required scrutiny and approval from Defendant's Washington, D.C. office.  (Doc. #23-2 at 61).  According to Laseter, Plaintiff's failure to observe these particular protocols compromised Defendant's ability to sanction MAYCO Industries without the possibility of protracted litigation.  (Doc. #23-3 at 44).  As Area Director Roberto Sanchez explained, Plaintiff

> allowed employer representatives to walk around areas where high levels of lead were likely to be present and expected without any mention to the employer representatives.  He failed to sample an operation and then recommended citation for said operation.  Due to this lapses on following proper inspection procedures, the Regional Administrator refused to review the case and dismissed the case with strong admonishments to him for not following procedures and not protecting himself, as well as for his supervisor and myself for not properly supervising him and his activities.  It was not considered appropriate to issue significant penalties to an employer when the OSHA representative did not consider the conditions serious enough to protect him from the hazards being cited.

(Doc. #23-4 at 74).

Laseter ordered the sanctions be reduced to below $40,000, which meant that a "News Release" would not issued.  (Doc. #23-2 at 61).  Furthermore, at the meeting, she reprimanded Harold Ciancio, Plaintiff's immediate supervisor, as well as Roberto Sanchez, the Area Director. (Doc. #23-3 at 44).  Ciancio confirmed that Laseter reprimanded him and the Area Director because the MAYCO Industries inspection had been executed without observing the requisite protocols. (Doc. #23-3 at 45).

According to Plaintiff, since the October 6, 2005 meeting, his immediate supervisors, Ciancio and Sanchez, have not raised the PPE issues with the personnel at the Birmingham office.  (Doc.

---

employees of MAYCO was Sean Bland, HR/Safety Coordinator for MAYCO, Industries; another Black Man." (Doc. #23-5 at 113).

#23-2 at 63).  Moreover, prior to the October 6, 2005 meeting, Defendant executed other inspections,

but these inspections were not similarly scrutinized for adherence to the PPE protocols.  (Doc. #23-2

at 63).  For example, CSHO Ron Hynes conducted an inspection of Lee Brass Company in 2004.

(Doc. #23-2 at 63).  Like the MAYCO Industries inspection, this inspection concerned over-exposure

to lead.  (Doc. #23-2 at 63).  According to Plaintiff, Ron Hynes wore the same or substantially

similar protective gear as Plaintiff wore during the MAYCO Industries inspection.  (Doc. #23-2 at

63).  At the screening of the Lee Brass Company inspection, which resulted in recommended fines

of $122,200, everyone who attended the MAYCO Industries inspection, except for Laseter and

Sharon Calhoun, were present.  (Doc. #23-2 at 63).  Hynes was not reprimanded for failing to

observe the PPE protocols, and Defendant classified the case as "significant."  (Doc. #23-2 at 63).

In response to this allegation, Laseter stated that, to the extent that other employees failed to follow

the PPE requirements and she has known about them, they have received or would receive a

reprimand comparable to the one received by Plaintiff.  (Doc. #23-3 at 45-46).

In Plaintiff's informal complaint of discrimination, he claimed that the verbal reprimand that

he received by Laseter was the product of discrimination and/or retaliation:

> On October 6, 2005, I was discriminated against and
> reprimanded during the screening of a significant inspection
> (MAYCO Industries, Inc. inspection # 308764307).  The
> discrimination was in the form of the way my inspection was
> reviewed, the requirements, the procedures which were placed on me
> and my inspection which were not placed on other Industrial
> Hygienists and Safety Compliance Officer[s] in the Birmingham Area
> Office and in Region IV.  The verbal reprimand from the Regional
> Administrator (Cindy Coe-Laster), the Birmingham Area Director
> (Roberto Sanchez) and the Assistant Area Director (Harold Ciancio)
> was so severe that I started to turn in my resignation.  The verbal
> reprimand was for not wearing personal protective equipment during
> the inspection.  The personal protective equipment was not required

10

and was not worn by nor required of other compliance officer[s] conducting similar inspections before and after this one; nor was it worn by the Assistant Area Director (Harold Ciancio) or the Area Director (Roberto Sanchez) when conducting similar inspections. I was told as a result of me not wearing the personal equipment MAYCO Industries, Inc. can not [sic] be processed as a significant case; and Ms[.] Coe-Laster said there will not be a "News Release." I now believe the intent of the verbal abuse/reprimand was to get be to resign . . . .

(Doc. #23-3 at 49-51). Laseter denied that the motivation for the reprimand was Plaintiff's age, sex, race, or prior EEO activity; instead, the reprimand stemmed solely from Plaintiff's failure to observe the protective gear protocols. (Doc. #23-3 at 45). Plaintiff does not dispute Laseter's explanation. (Doc. #23-3 at 73). Instead, Plaintiff merely indicates that Laseter had been aware of his prior EEO activity. (Doc. #23-3 at 73).

## C.    October 11, 2005 Performance Appraisal

In mid-2005, Harold Ciancio informed Plaintiff that the MAYCO Industries case would be pushed into the next fiscal year although commenced in the fiscal year ending October 2005. (Doc. #23-3 at 74). Harold Ciancio suggested this maneuver to ensure that two "significant cases" were reported by the Birmingham Area Office during the beginning of the fiscal year, which would elevate the Office's overall performance. (Doc. #23-3 at 74). Plaintiff objected because, according to Plaintiff, if an employee initiates an inspection during one fiscal year and closes it during another, he or she cannot be credited for the work on a performance appraisal. (Doc. #23-3 at 74).[3] At bottom, Plaintiff was "tired of others using [his] work to get promoted and [he] [got] neither credit nor mention." (Doc. #23-3 at 74). During this conversation, Plaintiff questioned whether two other

---

[3]Contrary to this suggestion, in Plaintiff's performance appraisal issued for fiscal year beginning October 2005 and ending October 2006, he was rated as "exceeding expectations" for the on-site inspection category specifically due to his work on the MAYCO Industries inspection. (Doc. #23-5 at 119-20).

11

inspections, presumably conducted prior to the then fiscal year, that he had conducted with Ciancio appeared on his performance appraisals because they had not been mentioned on Plaintiff's performance appraisals. (Doc. #23-3 at 74). Plaintiff concluded the conversation by stating that if he received another blank performance appraisal without details concerning his efforts and contributions, then he (1) would not sign the document and (2) would file a grievance. (Doc. #23-3 at 74).

On October 11, 2005, Plaintiff received his annual performance appraisal from his immediate supervisor, Ciancio. (Doc. #23-2 at 65). The performance appraisal covered the period beginning October 5, 2004 and ending October 1, 2005. (Doc. #23-2 at 65). Defendant's standard performance appraisals for non-managers and non-supervisors, such as Plaintiff, divides the rating into five possible classifications:

(1)  <u>Exemplary</u>: "Exceed standards for all elements;"
(2)  <u>Highly Effective</u>: "Exceeds 50% or more elements but not all; meet standards for all other elements;"
(3)  <u>Effective</u>: "Meet standards for all elements and may exceed standards for less than 50% of elements;"
(4)  <u>Minimally Satisfactory</u>: "Need to improve performance for one or more elements;" and
(5)  <u>Unacceptable</u>: "Fail to meet standards on or more elements"

(Doc. #23-3 at 24). Additionally, more targeted rating sheets are included in the annual performance appraisal. (Doc. #23-3 at 25-29). The narrower review considers three categories: (1) building partnerships and improving the agency's effectiveness;[4] (2) on-site inspection;[5] and (3) case

---

[4]This element requires consideration of the following standard: "The Compliance Officer participates in planning and executing safety and health program activity that serves our customer and improves OSHA's mission of assuring worker protection." (Doc. #23-3 at 26).

[5]This element requires consideration of the following standard: "The Compliance Officer performs complex inspections in accordance with agency policy and organizational goals. The scope and focus of the inspection is based on the type of inspection, the hazards found and the effectiveness of the employer's safety and health program." (Doc.

management.[6]   (Doc. #23-3 at 25).   For each sub-category, the reviewer may select one of the following assessments:

(1)    "Exceeds described level of performance (narrative required)"
(2)    "Meets described level of performance (no narrative required)"
(3)    "Needs to improve in order to meet the level of performance in the standard (narrative required)"
(4)    "Fails to meet described level of performance (narrative required)"

(Doc. #23-3 at 26-28).

Ciancio checked the "effective" box for Plaintiff's performance during the relevant period. (Doc. #23-3 at 24).  He checked the "meets described level of performance" blank on each of the specific category ratings.  (Doc. #23-3 at 26-28).  He did not include a narrative account explaining the basis for his assessment.  (Doc. #23-3 at 24).  According to Plaintiff, however, "[o]ther compliance officers, both Safety and Health, with less note worthy [sic] accomplishments got better ratings and written narratives."  (Doc. #23-3 at 51).  Moreover, Plaintiff alleges that other Industrial Hygienists received performance ratings lower than what they usually receive as well as narratives to justify giving Plaintiff an average assessment.  (Doc. #23-3 at 74).

According to Ciancio, on October 11, 2005, as he attempted to explain only the rating to Plaintiff, Plaintiff said, "I'm not going to sign this," began to leave the office, and finally said, "I'm going to file a grievance because I'm tired of this [shit]."  (Doc. #23-5 at 35).  Plaintiff claims that Ciancio said, during the course of the meeting, "I do not see why the people in the Regional Office

---

#23-3 at 27).

[6]This element requires consideration of the following standard: "The Compliance Officer plans, prepares, organizes, and documents complex enforcement and non-enforcement cases in accordance with agency policy and organizational goals."  (Doc. #23-3 at 28).

think you are a bad compliance officer and a trouble maker." (Doc. #23-2 at 58). And at some point during the conversation, Ciancio allegedly responded to Plaintiff by saying, "Shit flow [sic] down hill." (Doc. #23-3 at 74).[7]

Ciancio has denied making the statements claimed by Plaintiff. (Doc. #23-5 at 35). Ciancio has also denied that the "meets" appraisal or the lack of a narrative is the product of retaliation and/or discrimination. (Doc. #23-3 at 46). Instead, he notes that Defendant's policy did not require a narrative unless the employee fell either above or below the average rating. (Doc. #23-3 at 46). For example, in Plaintiff's performance appraisal for the period beginning April 2002 and ending October 2002, Ciancio rated Plaintiff as having exceeded expectations for the on-site inspection category. (Doc. #23-4 at 10). Ciancio provided a written narrative explaining the basis for his assessment. (Doc. #23-4 at 10). For the period relevant to this case, however, Ciancio concluded that Plaintiff had not earned a rating above "meets expectations:"

> [E]xamples of his minimal performance would be the fact that he has had to be specifically assigned to go back to several sites to get information that should have been collected at the very beginning of the inspection. He consistently argues over standards that do not apply to a violation that he insists apply but he can not [sic] support or does not have the supporting documents to support the violation(s). When onsite he has not followed the inspecting company's policy such as in MAYCO Industries inspections. He did not wear appropriate Personal Protective Equipment (PPE) while onsite and he did not require the accompanying management officials to wear the required PPE. When the hazards of Lead was [sic] completely understood by [Plaintiff] at that inspection site. . . . [Plaintiff] has been instructed several times to make this video [of the MAYCO Industries inspection] along with other inspection videos to be place[d] in the appropriate case files. To date he has not . . . .

---

[7]In particular, based on the record, it is uncertain whether Harold Ciancio made this comment in response to Plaintiff's stated intention to file a grievance.

(Doc. #23-4 at 3).  Moreover, according to Ciancio, Plaintiff had the opportunity to demonstrate after receiving his appraisal that he had, indeed, exceeded expectations, but Plaintiff declined the offer. (Doc. #23-3 at 46).

Plaintiff asserts that he suffered two injuries as a result of the average performance appraisal: (1) loss of an unspecified cash bonus award (Doc. #23-2 at 26); and (2) loss of unspecified promotions.[8]  (Doc. #23-2 at 26).

In Plaintiff's informal and formal complaints during the administrative review process, he alleged that only his October 2004 through October 2005 performance review constituted discrimination and/or retaliation.  (Doc. #23-2 at 58; Doc. #23-3 at 51).  Although Plaintiff's complaint in this lawsuit does not specify which performance appraisals he claims are discriminatory and/or retaliatory, his opposition to Defendant's motion for summary judgment (as well as his responses to Defendant's interrogatories) contends that his performance appraisals for years 2002, 2003, 2004, and 2005 were discriminatory and/or retaliatory.  (Doc. #24 at 5).

### D.     September 30, 2005 Denial of Personal Protective Equipment

In Plaintiff's informal complaint, he stated that on September 30, 2005, at around 11:00 a.m., Ciancio called him at home and said "if [Plaintiff] was at the office today he would take [Plaintiff] to get some safety shoes."  (Doc. #23-3 at 51).  Because Plaintiff was not at the office, however, Ciancio told him that he would have to wait until the next fiscal year to purchase the safety shoes. (Doc. #23-3 at 51).  Plaintiff responded to Ciancio by stating that "this is degrading; [you] have to take me to get safety shoes, like a father who takes a little child to get shoes."  (Doc. #23-3 at 75).

---

[8] Plaintiff makes this assertion because the appraisals are critical to being promoted, and he was given an average assessment.

Plaintiff further investigated, and, according to him, Ciancio had not insisted on joining other employees while they purchased safety shoes.  (Doc. #23-3 at 75).

Ciancio has offered the following explanation regarding this exchange.  According to him, he controls the Birmingham Area Office's General Services Administration credit card.  (Doc. #23-5 at 36).  On September 30, 2005, the Birmingham Area Office received $2,400.00, which was required to be spent on that day.  (Doc. #23-5 at 37).  Accordingly, Ciancio had sufficient funds on the credit card to purchase for Plaintiff the requested protective shoes.  (Doc. #23-5 at 37). Critically, "[s]hoes and eye protection if purchased with the office credit card cannot be purchased from just anywhere."  (Doc. #23-5 at 37).  Ciancio offered to meet Plaintiff at the appropriate shoe store, which Ciancio uses to purchase foot protection, and Plaintiff could select the shoes that he wanted.  (Doc. #23-5 at 37).  Alternatively, Ciancio told Plaintiff that "he could go to the shoe store that day and pick them out and [Harold Ciancio] can pay for them over the phone but he needed to go that day because, [he] had the funds available for that day only due to the end of the fiscal year." (Doc. #23-5 at 37).  Importantly, the next fiscal year began the following day.  (Doc. #23-3 at 46).

Plaintiff claims that by that point, he had been requesting safety shoes and safety glasses for more than two years.  (Doc. #23-3 at 51).  Although he had received safety glasses in 2004, he requires prescription safety glasses, which he has not received since 1989.  (Doc. #23-3 at 76). Plaintiff had not received safety shoes since 2003.  (Doc. #23-5 at 87).  Plaintiff contends that Defendant's policy mandates annual receipt of prescription safety glasses and safety shoes.  (Doc. #23-3 at 75).

Pursuant to Defendant's internal policies, employees are entitled to capped reimbursements for protective eye glasses as well as safety shoes:

3.      Safety Glasses.

. . . .

b.      General Policy.

(1) Employee's reimbursement for the purchase of safety glasses cannot exceed $65.

(2) In order to obtain reimbursement, an individual requiring prescription safety glasses will be required to submit to his immediate supervisor a lenses prescription issued within the last year. The individual must have his eye examination performed by an optometrist or opthamologist at no expense to the Government.

(3) Safety glasses will be replaced or repaired when determined necessary by the individual's immediate supervisor.

. . . .

4.      Safety Shoes and Caulked Logging Boots.

. . . .

b.      General Policy

(1) The regional safety representative will determine the types of protective footwear to be worn in "foot hazardous" area.

(2) Authorized employees are initially entitled to the purchase of two pairs of safety shoes and/or one pair of caulked logging boots at agency expense. Thereafter, each authorized employee is entitled to the reimbursement purchase of only one pair of safety shoes in any twelve month period or one pair of caulked logging boots in any 36 months period. Maximum reimbursement in limited to [$]40.00 for each pair of safety shoes or $150 for a pair of caulked logging boots.

(Doc. #23-3 at 33-35). Additionally, to obtain the reimbursement, the employee must adhere to the following procedure:

a.      The employee prepares a "Statement of Justification" and forwards it to the immediate supervisor.

b.      The immediate supervisor reviews the statement. If approval is granted, the immediate supervisor signs the "Statement of Justification" and returns it to the employee.

c.      The employee obtains the personal protective equipment and returns to the supervisor:

(1) SF 1034 (Public Voucher for Purchases and Services other than Personal),

(2) The "Statement of Justification,"

(3) The eye prescription (if Prescription safety glasses).

d.      The supervisor confirms that the policies and standards applicable to the protective equipment are met. That official then

17

forwards SF 1034 and the "Statement Justification" to the Management Officer (or at the National Office level to the Office of Financial Management) for requestor's reimbursement action.

(Doc. #23-2 at 36).

Ciancio explained the practical operation of this policy: "[T]hough compliance officers are entitled to get new shoes and glasses once a year, no compliance officers in the office gets new shoes and glasses every year." (Doc. #23-3 at 46). Moreover, "[h]e indicated that shoes are generally purchased as needed and not just because employees are allowed to get a new pair once a year." (Doc. #23-3 at 46).

Near the conclusion of Plaintiff's informal EEO process, the counselor contacted Ciancio and attempted to resolve the personal protective equipment issue. In response, on December 14, 2005, Ciancio authorized the reimbursement for Plaintiff's prescription safety glasses and safety shoes. (Doc. #23-5 at 87).

**E.      November 2, 2005 Reference to Plaintiff's Work Area as the "Dinosaur Area"**

According to Plaintiff, during a staff meeting on November 2, 2005, Roberto Sanchez, Defendant's Area Director, referred to the area of the office where Plaintiff's cubicle is located as the "dinosaur area." (Doc. #23-3 at 51). In response, Roberto Sanchez "indicated that he does not recall making the statement, but if it was made, it would have been in a joking context and not a reference to ages of the employees in the area." (Doc. #23-3 at 47).

**F.      Defendant's Refusal to Permit Plaintiff to Serve as Area Director and Assistant Area Director**

According to Plaintiff's informal complaint, "[y]ounger compliance officers are allowed to act as Area Director; within the past three years [he] [had] only been allowed to act as Area Director

18

once."  (Doc. #23-3 at 51).  Plaintiff alleges that he was the "[l]ast selected in the rotation for temporary [Area Director] or [Assistant Area Director] duties."  (Doc. #23-2 at 26).  In particular, Plaintiff served as Acting Area Director beginning August 5, 2005, two months prior to filing his EEO informal complaint.  (Doc. #23-3 at 77).  According to Plaintiff, the only reason Area Director Roberto Sanchez selected him was because he "got word that [Plaintiff] will file an EEO Complaint."  (Doc. #23-3 at 77).[9]

Sanchez explained the nature of this policy: "[T]wo times a year, compliance officers (7 safety officers and 4 industrial hygienists) are given [the] opportunity [to serve as acting Area Director]. . . . [S]elections are made on a rotational basis and . . . [Plaintiff] had been selected to act. [T]hree compliance officers (two younger and one older [than Plaintiff]) have not had the opportunity to act yet."  (Doc. #23-3 at 48).  Moreover, according to Sanchez, age was not a "factor in selecting employees to act in these positions."  (Doc. #23-3 at 48).

Importantly, and contrary to Plaintiff's suggestion, only one employee has been Acting Area Director more than once.  "She is an African American employee and shop steward.  This occurred during the office relocation when all the employees were assigned field work.  She was selected because, as shop steward, she had been directly involved in the Union/Management negotiations leading to the move of the office and was best able to oversee the moving activities taking place at the time."  (Doc. #23-4 at 76).  Finally, regarding Plaintiff's allegation regarding Defendant passing him over for Acting Assistant Director, Sanchez stated that "no one has been assigned in this

---

[9]Area Director Roberto Sanchez rejected Plaintiff's suggestion: "[Plaintiff] was assigned as Acting Area Director following [the prescribed procedure].  I had no knowledge of [his] intention to file a complaint at the time he was assigned as Acting Area Director.  His assignment took place months prior to his filing and me becoming aware of his filing."  (Doc. #23-4 at 76).

capacity," and rotating the position of Acting Assistant Director is not Defendant's practice or policy.

(Doc. #23-4 at 76).

### G.    Denial of Supplies or Equipment

According to Plaintiff's informal complaint, "[i]f [Plaintiff] request[s] supplies or equipment

(such as belts to fold sampling pump on employees)," then his request is denied while the requests

of younger employees are granted. (Doc. #23-3 at 51).  In Plaintiff's formal complaint to the CRC,

he clarified:

> [T]he young and female employees have no trouble getting
> equipment to do their job. . . . A young compliance officer request[ed]
> the safety glasses which [were] purchased by management.  I [asked]
> for belts to hold sampling pumps on employees back in 2002, and I
> have asked for the belts in about every staff meeting since then.  I told
> management on many occasions that I could not sample many
> potentially exposed female[] and some male[] employees because
> often females would wear elastic band pants, with no belts.  The
> weight of the pumps would pull down on their pants, if hooked to
> their pants, exposing their underwear.  And some men would [wear]
> cover-alls [sic] with no where [sic] to hook a pump.  A younger
> female compliance officer needed belts and requested them and
> within a couple of weeks after she requested belts there were five for
> each Industrial Hygienist.

(Doc. #23-2 at 68).  Plaintiff, despite having raised this concern during the administrative process,

drops this factual basis from his complaint in this lawsuit and in his memorandum opposing

summary judgment.  (Docs. #1, 24 at 5-6).

### H.    Relief Requested

Plaintiff requests "compensatory and punitive damages" as well as "a permanent injunction

enjoining Defendant[], its agents, successors, employees, attorneys and those acting in concert

therewith from continuing to violate 42 U.S.C. [§] [2000e]."  (Doc. #1 at 3).  During the course of

discovery, Plaintiff specified the basis for his damages claim: "My damages are not getting performance awards and losing the opportunity for advancement by having my performance ratings done below standard when they were in fact higher than standard.  I should have been given exceptional performances.  I have suffered mental distress because of the humiliation I received." (Doc. #23-2 at 27).

## III.    SUMMARY JUDGMENT STANDARD

Summary judgment is proper only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

A plaintiff in an employment discrimination case maintains the ultimate burden of proving that the adverse employment decision was made because of intentional discrimination.  *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509-12 (1993); *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1184 (11th Cir. 1984).  Although the Supreme Court previously established the basic allocation of burdens and order of proof in a disparate treatment case,  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981), as modified by *Desert Palace v. Costa*, 539 U.S. 90 (2003), that allocation scheme applies only in cases where there is no direct evidence of discrimination.  *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 595 (11th Cir. 1987).

Under the *McDonnell Douglas/Burdine* scheme, Plaintiff first has the burden of proving by a preponderance of evidence a *prima facie* case of discrimination.  Once Plaintiff proves a *prima facie* case, the burden of production shifts to Defendant to articulate a legitimate, nondiscriminatory reason for its employment decision.  Finally, if Defendant carries its burden, Plaintiff must *either* show that the legitimate reasons offered by the defendant are merely a pretext for discrimination *or* that discrimination was a "motivating factor" for the employment action, even though defendant's legitimate reason may also be true or have played some role in the decision.  *McDonnell Douglas Corp.*, 411 U.S. at 802-05; *Burdine*, 450 U.S. at 252-54; *Desert Palace*, 539 U.S. at 101-02.

## IV.   DISCUSSION

Defendant has moved for summary judgment on four grounds: (1) Plaintiff failed to timely answer requests for admission, which, if admitted, preclude his possibility of recovering against Defendant; (2) Plaintiff failed to administratively exhaust several actions or decisions that serve as the basis for his complaint; (3) Plaintiff's purported hostile work environment claim is due to be dismissed; and (4) Plaintiff's claim for punitive damages is legally unsupportable.  Importantly, Defendant has not moved for summary judgment on the merits of Plaintiff's Title VII retaliation and ADEA age discrimination claims, and moreover, Defendant has not contested Plaintiff's ability to satisfy his burden of production at the various stages of the *McDonnell Douglas* framework. Accordingly, the court limits its review of the Rule 56 evidence submitted only to Defendant's four stated contentions.

### A.   Plaintiff's late answers to Defendant's requests for admission effectively withdraw his admissions

Although he eventually (and belatedly) responded, Plaintiff failed to timely respond to Defendant's requests for admission.  Accordingly, Defendant contends that, because of Plaintiff's late reply, the following requests for admission, served on Plaintiff on October 17, 2008, are deemed admitted and, thus, are undisputed facts:[10]

> 1.     Admit that you have no evidence of pretext to support your claims of race, retaliation/reprisal, or age discrimination as alleged in plaintiff's complaint.
>
> 2.     Admit that you suffered no permanent injury preventing you from returning to your usual work as a result of the alleged race, retaliation/reprisal, or age discrimination that is made the basis of your complaint.
>
> 3.     Admit that you have not sought medical treatment as a result of the alleged discrimination that is made the basis of your complaint.
>
> 4.     Admit that your complaint before the Court raises only claims of race, retaliation/reprisal, or age discrimination and that any other cognizable claims under Title VII, or otherwise, are barred.
>
> 5.     Admit that you have no economic losses as a result of any discrimination alleged in your complaint.
>
> 6.     Admit that you have no direct evidence of race, retaliation/reprisal, or age discrimination with respect to allegations in your complaint.
>
> 7.     Admit that under the facts of your complaint with the U.S. Department of Labor, the federal sector provisions of the Age Discrimination in Employment Act, 29 U.S.C. § 633a, provides the sole and exclusive judicial remedy for your claims of age discrimination, and provides only for equitable relief, with compensatory damages being precluded.
>
> 8.     Admit that you are not entitled to a jury trial in a federal sector age discrimination case that you have alleged in your complaint.

---

[10]As an aside, several of Defendant's requests for admission are not properly matters of "fact" typically subject to the scope of this sort of discovery.  *See, e.g., Border Collie Rescue, Inc. v. Ryan*, 418 F. Supp. 2d 1330, 1339 n.6 (M.D. Fla. 2006) (concluding that a party's failure to respond to requests for admission that "impermissibly capture the essence of an entire claim . . . [and] call[] for a legal conclusion" is not an "admission"); *Manfred v. Everett*, No. 1:04-CV-3223, 2006 U.S. Dist. LEXIS 38126, at *6 n.2 (N.D. Ga. June 9, 2006) ("[T]his request calls for a legal conclusion which is impermissible.") (citations omitted).

> 9.      Admit that under the facts of your complaint, the Defendant had legitimate, non-discriminatory reasons for the employment decisions relating to your allegations.
>
> 10.     Admit that under the facts of your complaint, your claims for punitive damages cannot be maintained in a federal sector discrimination case.

(Doc. #23-2 at 16-17).  Plaintiff did not respond to the requests until January 21, 2009 (*i.e.*, 96 days after service).  (Doc. #23-2 at 46).  In his response to Defendant's request for admission, he replied:

> 1.      Denied.
> 2.      Admitted.
> 3.      Admitted.
> 4.      Admitted.
> 5.      Denied.  I lost awards and promotion opportunity.
> 6.      Denied.  I was in a group called the "dinosaurs."
> 7.      Admitted.
> 8.      Admitted.
> 9.      Denied.  See answers to interrogatories.
> 10.     Denied.

(Doc. #23-2 at 45).  Defendant did not file a motion pursuant to Federal Rule of Civil Procedure 36(a)(6)[11] requesting the court to determine the sufficiency of these answers.  Nearly three months later, in Plaintiff's Opposition to Defendant's Motion for Summary Judgment, he explained why his late responses should be excused or, alternatively, why they should not be transformed into admissions:

> The request for admissions were lumped in with the interrogatories and request for production and were not identified as being a part of the discovery request on the first page of the discovery requests and thus were missed.  Additionally, no motion to admit was filed on the plaintiff's responses to the requests for admissions when they were finally submitted.

---

[11] According to Federal Rule of Civil Procedure 36(a)(6), "[t]he requesting party may move to determine the sufficiency of an answer or objection.  Unless the court finds an objection justified, it must order that answer be served.  On finding that an answer does not comply with this rule, the court may order either that the matter is admitted or that an amended answer be served.  The court may defer its final decision until a pretrial conference or a specified time before trial."

(Doc. #24 at 3 ¶ 14).

According to Rule 36(a)(3), "[a] matter is admitted unless, within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection addressed to the matter and signed by the party or its attorney."  If a party fails to respond within 30 days, "[a] matter admitted under [Rule 36] is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended."  FED. R. CIV. P. 36(b).  When considering such a motion, "the court may permit withdrawal or amendment if it would promote the presentation of the merits of the action and if the court is not persuaded that it would prejudice the requesting party in maintaining or defending the action on the merits."  *Id.*

The court considers Plaintiff's late-filed discovery response, together with his explanation contained in his opposition memorandum, to be a request for relief under Rule 36(b).[12]  Rule 36(b) "establishes a two-part test" the court must apply when "considering the withdrawal of admissions: first, that the presentation of the merits will not be subserved by the withdrawal, and second, that the party obtaining the admissions would not be prejudiced in its presentation of the case by the

---

[12]Aside from Plaintiff's explanation in his memorandum in opposition to summary judgment, he never filed a motion to permit a late answer or to amend the admission.  Rule 36(b) requires the court to rule "on motion" of the party, but the courts have rejected an overly technical approach requiring a formal motion.  *See, e.g.*, *Kerry Steel, Inc. v. Paragon Indus., Inc.*, 106 F.3d 147, 154 (6th Cir. 1997) ("[W]e are reluctant to assign talismanic significance to the attorney's failure to use the phrase 'I move.'"); *Bergemann v. United States*, 820 F.2d 1117, 1121 (10th Cir. 1987) (concluding that the district court properly construed an opposition to summary judgment as a request to withdraw an admission); *Chancellor v. City of Detroit*, 454 F. Supp. 2d 645, 666 (E.D. Mich. 2006) ("Here, the Plaintiff filed his denials to the Requests to Admit only three days late.  Those denials may be deemed the functional equivalent of a request to withdraw."); *see also* 7-36 MOORE'S FEDERAL PRACTICE – CIVIL § 36.13 (2009) ("A formal written motion to withdraw is not necessary.  A request to withdraw usually may be made orally or may be imputed from a party's action. Courts have even found that a late response to requests for admission is equivalent to a withdrawal of a deemed admission.").

Thus, Rule 36(b)'s motion requirement is not intended to be an unduly formalistic hurdle for relief.  Rather, specifying that the court must rule "on motion" serves the unremarkable purpose of notifying the court of the party's request for relief and providing the opposing party with an opportunity to respond.  Here, Plaintiff's eventual discovery answers, together with his informal request in the memorandum, serve this purpose.  Defendant had an opportunity to respond and, indeed, actually responded in its summary judgment reply brief.  Accordingly, the motion requirement is satisfied here.

withdrawal." *Smith v. First Nat'l Bank of Atlanta*, 837 F.2d 1575, 1577 (11th Cir. 1988) (citation omitted). Although the court has discretion whether to permit a party to withdraw an admission, the court "abuses its discretion under Rule 36(b) in denying a motion to withdraw or amend admissions when it applies some other criterion beyond the two-part test – or grossly misapplies the two-part test – in making its ruling." *Perez v. Miami-Dade County*, 297 F.3d 1255, 1265 (11th Cir. 2002) (citing *Gutting v. Falstaff Brewing Corp.*, 710 F.2d 1309, 1313 (8th Cir. 1983)); *see also Essex Builders Group, Inc. v. Amerisure Ins. Co.*, 230 F.R.D. 682, 686 (M.D. Fla. 2005) ("The proper focus is . . . not the moving party's excuse for its erroneous decision."). Guiding the court's assessment is the Advisory Committee's observation that the possibility of withdrawal or amendment "emphasizes the importance of having the action resolved on the merits, while at the same time assuring each party that justified reliance on an admission in preparation for trial will not operate to his prejudice." FED. R. CIV. P. 36 Advisory Committee Note (1970 Amendment).

Plaintiff's stated justifications for withdrawing the admissions are irrelevant to this inquiry. First, according to Plaintiff, the admissions should be amended because Defendant "lumped [them] in with the interrogatories and request for production." (Doc. #24 at 3 ¶ 14). The Federal Rules of Civil Procedure do not require a party to sever and separately serve each form of discovery. Second, Plaintiff argues that, before a late-filed response to a request for admission can be deemed an admission, Defendant was required to request the court's approval. (Doc. #24 at 3 ¶ 14). But under Rule 36(a)(3), a matter becomes admitted by operation of law when the party to whom discovery is served fails to respond within 30 days. In other words, neither motion nor the court's involvement is required in order to transform a failure to respond into a matter admitted.

Having rejected these assertions by Plaintiff, the court turns its attention to the proper application of Rule 36(b).  Regarding the Rule's first prong (*i.e.*, whether the presentation of the merits will be promoted), the Eleventh Circuit concluded that "[t]his part of the test emphasizes the importance of having the action resolved on the merits and is satisfied when upholding the admissions would practically eliminate any presentation of the merits of the case."  *Perez*, 297 F.3d at 1266 (citations and internal quotation marks omitted).  Here, based on Defendant's own argument – "[w]ith the admissions of record, Plaintiff's claims fail, and his Complaint should be dismissed" – precluding Plaintiff from withdrawing the admissions would sound the death knell for the litigation.

Specifically, Request for Admission ("RFA") Six required Plaintiff to admit that he had no direct evidence of retaliation or age discrimination.  If RFA Six is admitted, then the litigation does not conclude; rather, the absence of direct evidence triggers application of the circumstantial proof structure.  *See, e.g.*, *Sullivan v. City of Satsuma*, No. 04-0473, 2005 U.S. Dist. LEXIS 33017, at *38 (S.D. Ala. Sept. 9, 2005) ("In the absence of direct evidence, Title VII retaliation claims turn on precisely the same traditional *McDonnell Douglas* burden-shifting principles as do other Title VII claims.").  But under this approach, if Plaintiff makes out his *prima facie* case of retaliation and/or age discrimination, Defendant can rebut the inference of illegality by showing a legitimate, non-discriminatory basis for its decision and/or action.  *See, e.g.*, *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001) ("Once a plaintiff has established a *prima facie* case, the employer then has an opportunity to articulate a legitimate, non-retaliatory reason for the challenged employment action.") (citations omitted).  RFA Nine, however, required Plaintiff to admit that Defendant had a legitimate, non-discriminatory basis for the employment decisions relating to his

allegations.  To overcome this "evidence" showing legitimate, non-discriminatory justification for the decision or action, Plaintiff must present evidence suggesting that Defendant's stated purpose is mere pretext.  *See, e.g.*, *id.* ("The ultimate burden of proving by a preponderance of the evidence that the reason provided by the employer is a pretext for prohibited, retaliatory conduct remains on the plaintiff.") (citation omitted).  RFA One requested Plaintiff to admit that he had no evidence of pretext.  Thus, as a practical matter, RFAs One, Six, and Nine – taken together and in light of the underlying substantive law – eliminate the possibility of even reaching the merits of Plaintiff's case and, as Defendant requests, warrants judgment on both counts against Plaintiff.

RFA Five concerns whether (and to what extent) Plaintiff has suffered economic losses as a result of Defendant's allegedly discriminatory decisions.  A lack of economic harm in a Title VII or ADEA claim does not foreclose the possibility of recovery, especially when injunctive relief is sought (as is the case here).  Nevertheless, the Eleventh Circuit's decision in *First National Bank* strongly suggests that Plaintiff's amendment to the admission is warranted.  Specifically, in that case, the Eleventh Circuit affirmed the district court's decision to permit the defendant to amend its deemed admission.  *First Nat'l Bank*, 837 F.2d at 1577.  Informing the district court's decision was that, but for the deemed admission, the defendant would not necessarily have been exposed to a significant money judgment.  *Id.*  Similarly, in this case, although Plaintiff does not risk exposure to liability, as was the case in *First National Bank*, accepting the admission would extinguish the possibility of Plaintiff recovering relief, if any, to compensate him for economic loss.

Therefore, RFAs One, Five, Six, and Nine[13] replace meaningful inquiry into the merits of Plaintiff's case with a penalty for Plaintiff's procedural misstep.  Although the court does not approve of Plaintiff's tardiness, as adherence to deadlines is critical to professional conduct and judicial expediency, the court is unwilling to adopt Defendant's position and, in effect, sanction Plaintiff for his delay.  Further, the Rule 56 record is replete with evidence that, at the very least, satisfies Plaintiff's burden of production with regard to these issues.[14]  In response to Plaintiff's analysis of the submitted evidence, Defendant has not answered the record citations by disputing the factual representations made by Plaintiff.  The court concludes that the merits are better promoted by allowing Plaintiff's untimely answers to amend his earlier admissions, particularly in light of the uncontested record submitted by Defendant.

Regarding the second prong, whether the non-moving party would be prejudiced by a withdrawal or amendment of admissions, Rule 36(b) prejudice "is not simply that the party who initially obtained the admission will now have to convince the fact finder of its truth.  Rather, it relates to the difficulty a party may face in proving its case, *e.g.*, caused by unavailability of key witnesses, because of the sudden need to obtain evidence with respect to the questions previously answered by the admissions."  *First Nat'l Bank*, 837 F.2d at 1578 (quoting *Brook Village North Assoc. v. Gen. Elec. Co.*, 686 F.2d 66, 70 (1st Cir. 1982)); *see also ADM Agri-Indus., Ltd. v. Harvey*, 200 F.R.D. 467, 471 (M.D. Ala. 2001) (concluding that prejudice is not "the simple fact that [the

---

[13]RFA Ten concerns the legal availability of punitive damages.  As discussed *infra*, the statutory scheme precludes recovering punitive damages against a government agency in a lawsuit brought under Title VII or the ADEA.  Accordingly, to the extent that RFA Ten's admission is withdrawn, Plaintiff's subsequent denial is irrelevant to the ultimate question as to whether punitive damages are available against Defendant (*i.e.*, the relevant law governs – not the concession of a party).

[14]More importantly, Defendant does not dispute that the record it submitted, and with which Plaintiff agreed, does not satisfy Plaintiff's burden of production.

proponent's] case is worse off without the admissions" but rather is "proof problems related to the process of having and then losing the admissions").  Indeed, if the only prejudice Defendant would suffer is "the inconvenience in having to gather evidence," then Defendant's justification does "not rise to a level of prejudice that justifie[s] a denial of the withdrawal motion."  *Perez*, 297 F.3d at 1268 (quoting *Hadley v. United States*, 45 F.3d 1345, 1349 (9th Cir. 1995)); *see also Raiser v. Utah County*, 409 F.3d 1243, 1246 (10th Cir. 2005) ("[P]reparing a summary judgment motion in reliance upon an erroneous admission does not constitute prejudice.") (citation omitted); *Essex Builders Group, Inc.*, 230 F.R.D. at 687 ("[T]he court is more likely to find prejudice if the opposing party was somehow lulled into reliance upon the admissions due to the movant's failure to act timely.").

Here, Defendant has not identified, with particularity or otherwise, any prejudice that it would suffer as a result of permitting Plaintiff to amend his admissions.  Instead, Defendant argues that Plaintiff failed to observe the proper steps for retracting an admission – in other words, Defendant suggests that *Plaintiff* must persuade the court that *Defendant would not be prejudiced* if the amendment is permitted.  Defendant's argument, however, misplaces the relevant burden. When the court is presented with a request to amend or to withdraw an otherwise admitted matter, the burden squarely rests on the party attempting to invoke Rule 36(a)(3).  *See, e.g.*, *Raiser*, 409 F.3d at 1247 ("In ruling on a motion to grant such relief, 'the court's focus must be on the effect upon the litigation and *prejudice to the resisting party* rather than on the moving party's excuses for an erroneous admission.'") (quoting *In re Durability Inc.*, 212 F.3d 551, 556 (10th Cir. 2000)) (emphasis added).  To be clear, *Defendant* shoulders the burden of convincing the court *not to permit the amendment* on the basis of prejudice.  This approach comports with the Eleventh Circuit's strong policy favoring resolution on the merits – not based on a party's procedural slip.

30

In this case, it is doubtful that Defendant would be prejudiced by permitting Plaintiff to amend or withdraw his admissions.  Critically, Plaintiff responded to the Requests for Admission before (1) the discovery cutoff and (2) Defendant filed its motion for summary judgment.  In the court's Scheduling Order (Doc. #13), entered March 24, 2008, the court set the deadline for the close of discovery at February 1, 2009 and the deadline for filing dispositive motions at February 15, 2009.  At the request of Defendant, on May 19, 2008, the court extended those deadlines by 60 days (*i.e.*, April 2, 2009 for the discovery cutoff, and April 20, 2009 for the dispositive motion deadline).  Defendant served the Requests for Admission on October 17, 2008, and Plaintiff eventually responded on January 21, 2009.  Accordingly, Defendant had approximately two months after receiving the responses to the Requests for Admission to reevaluate its discovery strategy and explore alternative avenues for obtaining the information sought.  Moreover, Defendant had before it Plaintiff's responses to interrogatories as well as the reports of investigation from the administrative process.  Finally, Defendant's prejudice argument is even more unavailing in light of the court indicating at the December 10, 2009 hearing that it will permit the parties to conduct additional discovery prior to the trial (if their attempts at mediation fail).  Thus, as Defendant has not specified, and the court is unwilling to invent, the prejudicial effect of permitting Plaintiff to amend his admissions, the admissions are deemed withdrawn and superseded by Plaintiff's eventual responses.

**B.      Plaintiff has failed to administratively exhaust Defendant's allegedly discriminatory or retaliatory actions that occurred before September 23, 2005**

To establish a *prima facie* case of retaliation under Title VII, Plaintiff must show that (1) he participated in an activity protected by Title VII; (2) he suffered an adverse employment action; and

(3) there is a causal connection between the participation in the protected activity and the adverse employment decision. *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000). Protected activity includes Plaintiff's opposition to "any practice made an unlawful employment practice by [Title VII]" or "participation in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). To establish a *prima facie* case of age discrimination under the ADEA, Plaintiff must prove that he "(1) was a member of the group of persons aged forty to seventy protected by the ADEA; (2) was subjected to adverse employment action; (3) was qualified to perform the job from which he was rejected; and (4) (a) was replaced by a substantially younger person or (b) similarly situated younger employees were treated more favorably." *Scarborough v. Mineta*, No. 3:03-CV-328, 2006 U.S. Dist. LEXIS 18218, at *13 (N.D. Fla. Apr. 7, 2006) (citations omitted).

Regarding the first prong of the retaliation *prima facie* case, in Plaintiff's opposition to summary judgment, he claimed three acts of opposition: (1) in 2003, after not receiving a cash award, Plaintiff told Ciancio that he was being treated worse than similarly situated white employees; (2) in 2005, after not receiving an exceptional performance award, Plaintiff told Ciancio that he did not receive the award on account of his race; and (3) in 2005, again after not receiving an exceptional performance award, Plaintiff told Ciancio and Sanchez that he did not receive the award on account of his race.

In his complaint, Plaintiff alleged four participatory activities as the bases for his retaliation claim: (1) in 1999, testifying, in an EEOC case and on behalf of Carrie Dooley, that African-Americans were being treated unequally by Defendant; (2) in 2000, settling with Defendant his prior lawsuit, which alleged a racially motivated decision not to promote him; (3) in 2002, providing an

affidavit, in Dooley's case, stating that African-Americans were being treated unequally by Defendant; and (4) in 2005, filing a charge with the EEO, which serves as the basis for this lawsuit.

As a result of participatory and opposition activities[15] as well as his age, the complaint alleges that Plaintiff suffered the following adverse employment actions:

(1)     "giving him poor performance ratings,"
(2)     "upbraiding him in front of others,"
(3)     "isolating him from others,"
(4)     "spreading rumors about him that he was a trouble maker,"
(5)     "refusing to buy him PPE equipment,"
(6)     "refusing to recognize his work accomplishments,"
(7)     "refusing to grant him service as acting Area Director,"
(8)     "omitting him from awards,"
(9)     "instituting institutional inquiries against him,"
(10)    "referring to his office as the 'dinosaur' room," and
(11)    "talking down to him, crudely and cruelly, including, at time, shouting at him as though he were deaf, knowing that he had high blood pressure and a weak constitution"

(Doc. #1 at 2).[16]

Although Title VII and the ADEA authorize an aggrieved federal employee to file a civil lawsuit, the employee, as a precondition to litigation against a federal employer, "must first seek

---

[15] Defendant has not contested Plaintiff's classification of these activities as satisfying the statutory requirement. Accordingly, the court assumes, for the limited purpose of assessing administrative exhaustion, that these events indeed constitute statutorily protected activities.

[16] Whether a plaintiff has suffered an adverse employment action in the context of a retaliation claim depends on whether "a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)). In this case, Defendant has not contested Plaintiff's characterization of these events as "materially adverse" for the purpose of making out a *prima facie* case of retaliation. Instead, Defendant argues only that Plaintiff failed to administratively exhaust these claims. Thus, the court assumes without deciding that these events constitute "adverse employment actions," as defined by *Burlington Northern*.

Similarly, in the context of an ADEA claim, it is unlawful for an employer "to discharge or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age . . . ." 29 U.S.C. § 623(a)(1). Defendant has not argued that these events failed to adversely impact Plaintiff's "terms, conditions, or privileges of employment." Accordingly, the court assumes without deciding that these events constitute "adverse employment actions" for the purpose of satisfying Plaintiff's *prima facie* case.

33

relief in the agency that has allegedly engaged in discrimination." *Grier v. Sec'y of Army*, 799 F.2d 721, 724 (11th Cir. 1986) (citing *Brown v. Gen. Servs. Admin.*, 425 U.S. 820, 832 (1976)); *see also Smith v. Potter*, 310 Fed. App'x 307, 310 (2009) (noting that the Federal Regulations governing administrative exhaustion apply to ADEA claims). The exhaustion requirement is not a mere formality; "rather, it is part and parcel of the congressional design to vest in the federal agencies and officials engaged in hiring and promoting personnel primary responsibility for maintaining nondiscrimination in employment." *Grier*, 799 F.2d at 724 (citation and internal quotation marks omitted).

According to 29 C.F.R. § 1614.105(a)(1), a federal employee's first step toward administrative exhaustion is filing a complaint with an EEO counselor in his or her agency "within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action." *See Andrews-Willmann v. Paulson*, 287 Fed. App'x 741, 745 (11th Cir. 2008) (requiring a federal employee asserting retaliation under Title VII to exhaust administrative remedies pursuant to 29 C.F.R. §§ 1614.105-1614.106); *see also* 29 C.F.R. § 1614.103(a) ("Complaints alleging retaliation prohibited by [Title VII] are considered to be complaints of discrimination for purposes of this part.").

Defendant argues that Plaintiff has failed to administratively exhaust many of the allegedly discriminatory actions that serve as the basis for his complaint. In this case, Plaintiff initially contacted an EEO counselor on November 7, 2005, and he filed his informal complaint on November 11, 2005.[17] (Doc. #23-2 at 30; Doc. #23-3 at 49). Applying the Federal Regulations's 45-

---

[17] According to the Eleventh Circuit, "when the claimant does not initiate contact within the 45-day charging period, the claim is barred for failure to exhaust administrative remedies." *Shiver v. Chertoff*, 549 F.3d 1342, 1344 (11th Cir. 2008) (citing *Brown v. Snow*, 440 F.3d 1259, 1264-65 (11th Cir. 2006). For purposes of the administrative

day window, the November 7, 2005 meeting satisfies the exhaustion requirement insofar as Plaintiff's lawsuit covers retaliatory and/or discriminatory acts or decisions occurring on or after September 23, 2005.  On the other hand, insofar as Plaintiff's lawsuit bases liability on events or decisions occurring before September 23, 2005, those events or decisions are not administratively exhausted and are, therefore, an impermissible basis for relief in this lawsuit.

The regulations include a possible expansion of the 45-day window when aggrieved federal employees essentially show good cause:

> The agency or the Commission shall extend the 45-day time limit . . . when the individual shows that he or she was not notified of the time limits and was not otherwise aware of them, that he or she did not know and reasonably should not have been known that the discriminatory matter or personnel action occurred, that despite due diligence he or she was prevented by circumstances beyond his or her control from contacting the counsel within the time limits, or for other reasons considered sufficient by the agency or the Commission.

29 C.F.R. § 1614.105(a)(2).  Nevertheless, Plaintiff has not demonstrated that he availed himself of this safe-harbor provision.

Alternatively, as the Eleventh Circuit has specified, "[t]he exhaustion period . . . is not a jurisdictional prerequisite, but rather 'a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling.'" *Smith*, 310 Fed. App'x at 310 (quoting *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982)).  "Under equitable tolling, 'a limitations period does not start to run until the facts which would support a charge of discrimination are apparent or should be apparent to a person with a reasonably prudent regard for his rights.'" *Id.* (quoting *Sturniolo v.*

---

exhaustion requirement, the Eleventh Circuit has keyed the analysis to a plaintiff's initiation of contact as opposed to the filing of an informal complaint.  Therefore, the date of Plaintiff's contact – not the date he filed the informal complaint – is relevant to assessing administrative exhaustion.  In any event, neither Defendant nor Plaintiff has objected to the November 7, 2005 date as the relevant benchmark.

*Sheaffer, Eaton, Inc.*, 15 F.3d 1023, 1025 (11th Cir. 1994)).  In this case, Plaintiff has not argued

equitable tolling in general or that he "did not know and reasonably could not have known that [he]

was the victim of discrimination" until November 7, 2005.  *Id.* at 310 n.3; *see also Miller v. Marsh*,

766 F.2d 490, 493 (11th Cir. 1985) ("[E]quitable tolling may be appropriate when a plaintiff has

been lulled into inaction by . . . state or federal agencies or if a plaintiff is actively misled . . . .")

(citation and internal quotation marks omitted).  Indeed, Plaintiff's prior EEO activity strongly

suggests that if he had considered pre-September 2005 events to have been discriminatory or

retaliatory, then he would have known the appropriate avenues to pursue for relief.

Thus, because the court is unwilling to imagine a justification for Plaintiff's failure to timely

notify an EEO counselor, the court applies the 45-day deadline for reporting allegedly retaliatory or

discriminatory actions as the litmus test for administrative exhaustion.  Accordingly, the timing of

the allegedly adverse employment actions[18] and, more precisely, Plaintiff's unequivocal notice of

them becomes critical.  Based on the Rule 56 record, the court is able to identify the dates of several

of Defendant's allegedly adverse employment actions, but not all of the relevant dates are specified

by *either* party.  Nevertheless, according to Plaintiff's statement at the December 10, 2009 hearing,

he conceded that none of his claims arise out of events occurring prior to September 23, 2005.  Thus,

to the extent that his complaint and subsequent briefs based liability on events preceding the 45-day

cutoff for administrative exhaustion, those claims are due to be dismissed against Defendant.

---

[18]It is the timing of the adverse employment action – *not* the participatory activity – that is relevant to
determining administrative exhaustion.  A plaintiff's cause of action for retaliation becomes complete once he or she
suffers an adverse employment action, which results from his or her statutorily protected activity.  Although the timing
of the participatory activity is relevant insofar as causation is concerned, for the limited purpose of assessing exhaustion,
only the timing of the adverse employment action is applicable.  *See, e.g.*, *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1100
n.19 (11th Cir. 1996) (noting that the exhaustion period "begins to run when the employee receives unequivocal notice
of the adverse employment decision") (citations omitted).

Alternatively, those events occurring within the relevant window are administratively exhausted and, consequently, proper bases for relief in this court.[19]

### C.    Plaintiff has not asserted a hostile work environment as a basis for recovery

Although Plaintiff admits he has not alleged a hostile work environment theory, Defendant curiously requests the court to enter summary judgment on such a claim: "Instead of establishing a severe and pervasive hostile work environment, Plaintiff's allegations describe the ordinary tribulations of the workplace and his general disagreement with management decisions.  As a matter of law, those allegations are insufficient to establish a legally cognizable hostile work environment." (Doc. #22 at 16-17).  Plaintiff's complaint includes only a retaliation claim and an age discrimination claim.  Although hostile work environment, retaliation, and age discrimination claims, at the margin, may resemble one another as a factual matter, the three claims are legally distinct.[20]  Accordingly, because Plaintiff's complaint does not contain a hostile work environment claim and Defendant has

---

[19]To be certain, however, the court emphasizes the narrowness of its conclusion.  The court is not suggesting that Plaintiff has produced evidence substantiating these claims or that these claims fit within the substantive framework – those considerations are simply not before the court.  Instead, the court is merely concluding that Plaintiff's claims, to the extent that they arise out of post-September 23, 2005 events, are administratively exhausted.

[20]*Compare Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002) (noting that, to establish a hostile work environment claim, a plaintiff must show "(1) that he belongs to a protected group; (2) that he has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee, such as national origin; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive work environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability") (citation omitted), *with Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001) (noting that, to establish a retaliation claim under Title VII, a plaintiff must show that "(1) he engaged in statutorily protected expression; (2) he suffered an adverse employment action; and (3) there is some causal relation between the two events") (citation omitted), *with Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1432 (11th Cir. 1998) (noting that, to establish an age discrimination claim under the ADEA, a plaintiff must show "(1) that he was a member of the protected group of persons between the ages of forty and seventy; (2) that he was subject to adverse employment action; (3) that a substantially younger person filled the position that he sought or from which he was discharged; and (4) that he was qualified to do the job for which he was rejected") (citation omitted).

not represented that Plaintiff's stated claims have transitioned into one, Defendant's motion for summary judgment is due to be denied.

**D.     Plaintiff's request for punitive damages is legally unsupportable**

Finally, Defendant moves for summary judgment on the availability of punitive damages. (Doc. #22 at 19).  Punitive damages are available against a defendant who has "engaged in unlawful intentional discrimination" as prohibited by Title VII, provided that "the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference . . . ."  42 U.S.C. § 1981a(a)(1) & (b)(1).  Punitive damages, however, are unavailable against "a government, government agency or political subdivision."  42 U.S.C. § 1981a(b)(1).  Defendant is a government agency, and Plaintiff has conceded that punitive damages are unavailable based on the facts of this case.  (Doc. #24 ¶ 13).  Thus, Plaintiff's request for punitive damages is without legal justification, and Defendant's request for summary judgment on this basis is due to be granted.

**V.     CONCLUSION**

Plaintiff's complaint contains two theories of recovery: (1) Title VII retaliation; and (2) ADEA discrimination.  Defendant has not explained whether evidence materially relevant to the disposition of these claims is undisputed or otherwise.  Instead, Defendant rests its summary judgment motion on four contentions: (1) Plaintiff's failure to timely respond to requests for admission precludes his two causes of action; (2) Plaintiff has failed to administratively exhaust his claims insofar as they stem from decisions or conduct that occurred more than 45 days prior to his EEO complaint; (3) Plaintiff is not permitted to assert a hostile work environment claim; and (4) punitive damages are unavailable against Defendant.  As explained above, the court accepts the

second and fourth contentions but otherwise rejects the first and third.  The court's decision, therefore, narrows the temporal scope of and damages available to Plaintiff's Title VII and ADEA claims, but nevertheless, the underlying claims, and certain types of relief, remain.  Specifically, to the extent that Plaintiff bases his causes of action on events which occurred within 45 days of his EEO consultation and requests relief other than punitive damages, Plaintiff's claims survive Defendant's motion for summary judgment.

   **DONE** and **ORDERED** this  5th  day of January, 2010.

            **R. DAVID PROCTOR**
            UNITED STATES DISTRICT JUDGE